NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>GREGGORY J. TAHMISIAN,<br><br>        Debtor. | Case No. 23-00002-BPH |
| GREGG TAHMISIAN, an individual, and SOLID STATE OPERATIONS, INC., an Idaho corporation,<br><br>        Plaintiffs,<br>  v.<br><br>NETACENT, INC., an Idaho corporation; ISAAC BARRETT, an individual; QUINN WATT, an individual; JORDAN BARRETT, an individual; and JOHN MCALLISTER, an individual,<br><br>        Defendants. | Adversary No. 23-06018-BPH<br><br>Chapter 11<br>(Subchapter V) |
| NETACENT, INC.,<br><br>        Counterclaimant,<br>  v.<br><br>GREGG TAHMISIAN and SOLID STATE OPERATIONS, INC.<br><br>        Counter-defendants. | |

**MEMORANDUM OF DECISION**

MEMORANDUM OF DECISION–1

Appearances:

> J. Justin May, JOHNSON MAY, PLLC, Boise, Idaho, Attorney for Plaintiff/Counter-Defendant Greggory J. Tahmisian.[1]

> Tracy L. Wright, HAWLEY TROXELL ENNIS & HAWLEY, LLP, Boise, Idaho, Attorney for Plaintiff /Counter-Defendant Solid State Operations, Inc.

> Elijah M. Watkins, STOEL RIVES, LLP, Boise, Idaho, Attorney for Defendants/Counter-Claimants Netacent, Inc., Isaac Barrett, Quinn Watt, and Jordan Barrett.

> William F. Gigray III and Brian Thomas O'Bannon, WHITE, PETERSON, GIGRAY & NICHOLS, PA, Nampa, Idaho, Attorneys for Defendant John McAllister.

## I. Introduction

The claims and counterclaims asserted in this case illustrate how conflict between shareholders in a closely held corporation can taint decisions by the Board of Directors, undermine sound management, and cause injury to the corporation. Underpinning the claims and counterclaims in this matter is a dispute between Netacent's two largest shareholders, Isaac Barrett ("Barrett") and Greg Tahmisian ("Tahmisian"), involving allegations of events that occurred when Tahmisian was president of the corporation. As the dispute unfolded, the remaining shareholders and Board of Directors sided with Barrett against Tahmisian, removed Tahmisian as president, installed Barrett as president of Netacent, and authorized various actions by the president, Board of Directors, and Netacent.

## II. Motion for Partial Summary Judgment

Before the Court is a motion for partial summary judgment ("Motion") filed by Netacent, Inc., Barrett, Jordan Barrett ("Jordan"), and Quinn Watt ("Watt") (collectively the "Netacent Parties").[2] The Netacent Parties argue and allege there are no genuine issues of material fact

---

[1] Subsequent to the hearing on the summary judgment motion, Mr. Tahmisian elected to represent himself and his counsel withdrew. Doc. Nos. 102 & 103.
[2] Doc. No. 46.

MEMORANDUM OF DECISION–2

with respect to Claims 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, and 19 in

Debtor/Counter-Defendant Tahmisian Amended Complaint and they request dismissal of those

counts.[3]

The Motion is opposed by Solid State Operations, Inc. ("Solid State"), John McAllister

("McAllister"), and Tahmisian.[4]  Each brief opposing the Motion includes a Statement of

Genuine Issues of Fact.  The Netacent Parties filed replies.[5]

Tahmisian's opposition was accompanied by a Motion to Strike portions of the Affidavit

of Issac Barrett, to which the Netacent Parties objected.[6]  The Motion to Strike and

corresponding objection, along with the other pleadings related to summary judgment motion,

highlight two very divergent explanations for events that occurred after the shareholder

discussions between Tahmisian and Barrett failed.  Resolution of the disputed issues in this case

is dependent on the credibility of Tahmisian, Barrett, and Watt.  While the Declaration of Isaac

Barrett contained numerous inadmissible statements which the Court has entirely disregarded, as

a general matter, the Court afforded the competing declarations of these parties very little weight.

A hearing on the Motion was held on April 4, 2024.  After considering the submissions

and arguments of the parties, as well as applicable law, the Motion is resolved as set forth in this

decision.  Fed. R. Bankr. P. 7052; 9014.

III.  Standards Governing Motions for Summary Judgment

A party may move for summary judgment, identifying each claim or defense, or the part

of each claim or defense, on which summary judgment is sought.  Summary judgment may be

granted when no genuine and disputed issues of material fact exist, and, when viewing the

---

[3] Doc. No. 34.
[4] Doc. Nos. 65-66; 67 & 69; 73.
[5] Doc. Nos. 79, 80, 81, 82, 84, 85, & 86.
[6] Doc. Nos. 74 & 83.

MEMORANDUM OF DECISION–3

evidence most favorably to the non-moving party, the movant is entitled to judgment as a matter of law. Civil Rule 56, incorporated by Rule 7056;[7] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Zetwick v. Cnty of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017).  In resolving a motion for summary judgment, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Zetwick*, 850 F.3d at 440. Moreover, the court does not weigh the evidence; rather it determines only whether a material factual dispute remains for trial.  *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997).

An issue is "genuine" if there is sufficient evidence for a reasonable finder of fact to find in favor of the non-moving party, and a fact is "material" if it might affect the outcome of the case. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  Where evidence is genuinely disputed on a particular issue, such as by conflicting testimony, that issue is inappropriate for resolution on summary judgment. *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016).

In cases where intent is at issue, summary judgment is seldom granted; however, "summary judgment is appropriate if all reasonable inferences defeat the claims of one side, even when intent is at issue." *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 165 (9th Cir. BAP 1999).  Summary judgment may be defeated by evidence "such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor."  *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015).  On the other hand, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

---

[7] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION–4

party, there is no genuine issue for trial and summary judgment is appropriate.  *Zetwick*, 850 F.3d 436 at 441.

The moving party bears the initial burden of showing there is no genuine issue of material fact.  *Martin v. Mowery (In re Mowery)*, 591 B.R. 1, 5 (Bankr. D. Idaho 2018) (citing *Esposito v. Noyes (In re Lake Country Invs.)*, 255 B.R. 588, 597 (Bankr. D. Idaho 2000) (citing *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998))).  If the non-moving party bears the ultimate burden of proof on an element at trial, the burden remains with that party to make a showing sufficient to establish the existence of that element in order to survive a motion for summary judgment.  *Id*.

Although the moving party bears the initial burden of showing there is no genuine issue of material fact, summary judgment may be granted to a non-moving party.  Civil Rule 56, made applicable in bankruptcy cases pursuant to Rule 7056, permits the Court some latitude with respect to summary judgment motions.  It provides:

> (f) Judgment Independent of the Motion.  After giving notice and a reasonable time to respond, the court may:
> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Thus, the fact that a party has not independently sought summary judgment or otherwise joined in a moving party's motion does not necessarily foreclose a grant of summary judgment to that party.  *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment *sua sponte* against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter."); *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 312 (9th Cir. 1982) ("[I]f one party moves for summary judgment and … it is made to

MEMORANDUM OF DECISION–5

appear from all the records, files, affidavits and documents presented that there is no genuine

dispute respecting a material fact essential to the proof of movant's case and that the case cannot

be proved if a trial should be held, the court may *sua sponte* grant summary judgment to the non-

moving party."); *Holmes v. Idaho Power Co. Sec. Plan for Senior Mgmt. Emps.*, No. CV03-514-

S-EJL, 2005 WL 1863180, at *1 (D. Idaho Aug. 4, 2005).

IV.  Undisputed Facts

    While much is disputed, there are facts upon which the parties agree.

    *A.  Tahmisian, Barrett, McAllister, and Watt; Netacent Corporation's formation*

        1.  Tahmisian, Barrett, McAllister and Watt's shared experience at the Idaho
        Department of Labor provide the foundation for Netacent Corporation, and its
        Unemployment Insurance product development

Netacent Solutions, LLC ("Netacent LLC") was formed by Tahmisian in May 2008 for

the purpose of consulting and software development.  Tahmisian was the sole member of

Netacent LLC.[8]  Two years later, Netacent LLC was retained as a subcontractor on a software

development project for the Idaho Department of Health and Welfare, ("IHW").[9]  Under their

arrangement, Tahmisian provided services to Netacent LLC and Netacent LLC billed the prime

contractor, KMP Companies ("KMP"), and KMP invoiced IHW for the services.  IHW paid

KMP, KMP paid Netacent, LLC, and Tahmisian received payment from Netacent LLC.[10]

    In 2012, Netacent LLC's services on behalf of IHW ended and its technical services for

the Idaho Department of Labor ("IDOL") began.[11]  The payment arrangement for IDOL was the

same as that with IHW, i.e., Tahmisian provided services to Netacent LLC, Netacent LLC billed

---

[8] Doc. No. 72-1 at ¶ 2.  The submissions filed in connection with the Motion are voluminous—totaling over 2,000 pages.  In the record, the same document may appear as several different exhibits.  The Court makes no attempt to cite to each instance where the same document appears in the record.
[9] Doc. No. 72-1 at ¶ 4.
[10] *Id.*
[11] Doc. No. 72-1 at ¶ 5.

MEMORANDUM OF DECISION–6

the prime contractor, KMP, and KMP invoiced IDOL.[12]  Through Netacent LLC's work for

IDOL, Tahmisian encountered McAllister.  McAllister was the Chief Deputy Director at IDOL.

Barrett was employed at IDOL as a database architect, and Watt was also an IDOL employee.

His position was described as a business analyst.[13]

    McAllister was employed by IDOL for 42 years.[14]  During the last four years of his

career with IDOL he was responsible for managing the construction of an automated system for

Unemployment Insurance ("UI").[15]  The automated UI system was launched in 2014.[16]  It was

the culmination of significant efforts, including work completed by Tahmisian and Barrett.

    Barrett transitioned from an employee to a contractor for IDOL.[17]  To do so, he formed

Emergent Systems, LLC ("Emergent").[18]  Barrett's arrangement was similar to Tahmisian's: he

provided services to Emergent, Emergent billed KMP, and KMP invoiced IDOL.[19]  On receipt of

payment by IDOL, KMP paid Emergent and Emergent compensated Barrett.

    <u>2.  Tahmisian and Barrett begin "moonlighting" while still providing services to
IDOL, and form Netacent</u>

    Prior to completion of the UI system, while still providing services to IDOL, Tahmisian

and Barrett formed Netacent Incorporated, an Idaho corporation ("Netacent").  Initially,

Tahmisian and Barrett were the sole Directors and shareholders.[20]  Each shareholder contributed

$5,000, along with certain intellectual property, specifically: Tahmisian caused Netacent LLC to

contribute certain intellectual property to Netacent and Barrett caused Emergent to contribute its

---

[12] *Id.*
[13] *Id.* at ¶ 5.
[14] Doc. No. 71 at ¶ 7.
[15] *Id.*
[16] *Id.*
[17] Doc. No. 72-1 at 7.
[18] Doc. No. 72-1 at 7.
[19] Doc. No. 72-1 at 7.
[20] Doc. No. 72-1 at 9.

MEMORANDUM OF DECISION–7

intellectual property as well.[21]  Each shareholder had 5,000 shares of stock in Netacent when it was formed.[22]

On July 1, 2013, Barrett and Tahmisian held a Board of Directors meeting, which recited the financial and intellectual property contributions to the new corporation, and during which they read proposed bylaws but tabled a vote on them until the next meeting.[23]  The filing of the Articles of Incorporation was "ratified."[24]  *Id.*  At the meeting, they elected Tahmisian as President and Barrett as Vice President of Netacent and set officer salaries at $0.[25]  That same day, they held a shareholder meeting at which they ratified the actions taken at the board meeting, and provided that Barrett and Tahmisian are "designated as the initial directors of this corporation in the Articles of Incorporation."[26]  At Netacent's inception, it is clear Barrett and Tahmisian were the only directors.[27]

From July 2013 until October 2015, Tahmisian and Barrett continued to perform services for IDOL.  However, instead of using either Netacent LLC or Emergent to bill KMP for hours worked by Tahmisian and Barrett, they submitted bills to KMP by Netacent, the newly formed corporation.  In essence, from its formation in July 2013 until October 2015, Netacent was a moonlighting venture that permitted Barrett and Tahmisian to work on side projects in addition to their work for IDOL.

In July 2014, Tahmisian and Barrett held a second Board of Director's meeting as well as a Shareholder meeting.  The minutes of the board meeting state that the Netacent corporate

---

[21] Doc. No. 72-1 at 8.
[22] Doc. No. 72-1 at ¶ 9.
[23] Doc. No. 72-1 at ¶ 11; 96-2.
[24] Doc. No. 72-1 at 10, Ex 4.
[25] *Id.*  Tahmisian remained President of Netacent until at least November 1, 2021, when the Board and Shareholders allegedly removed him as President.
[26] Doc. Nos. 46-23; 72-1 at ¶ 10; 96-3.
[27] Doc. No. 46-23 at ¶¶ 2 & 34; 46-23 at Ex. 1 ¶ 4.1; Doc. No. 96-3.

MEMORANDUM OF DECISION–8

Bylaws were presented and voted on.[28]  Salaries were set at $150,000 annually but were deferred until Netacent was able to pay them.[29]  The minutes of the shareholder meeting reflect a vote to increase the size of the board from two directors to three:[30]

> The following persons are designated as directors of this corporation in the Articles of Incorporation, and the shareholders approve and ratify this designation of the following persons as directors of this corporation until the next annual meeting of the shareholders of this corporation.
>
> Director: Isaac Barrett
> Director Roger Homles[31]
> Director Gregg Tahmisian[32]

In addition to increasing the size of the Board of Directors, the shareholder meeting minutes reflect Netacent's growing pains, finances, marketing efforts, and other minutiae:

> One debit card was issued and one credit card issued under Gregg Tahmisian's name.  One of each will also be issued under Isaac's name.  Company debit and credit cards will be used for company purchases.  A purchase document needs to be created and used for all purchases with company debit or credit cards. Contractors have been changed to company employees. . . .
>
> Current payable balance is $34,946.81.  Company is not in a position to pay back loans at this time. . . .
>
> Burn permit application was a strong success financially and with customer satisfaction. . . . Contacts at Idaho Labor are going well and will be financially successful.  With other state UI implementations, Netacent has reached out to Hawaii, Alabama, and Washington.  Alabama has had a positive response.  This will be strongly pursued after Idaho goes live with iUS.[33]

---

[28] Doc. Nos. 72-1 at ¶ 16; 96-5.
[29] Doc. No. 72-1 at ¶ 27.
[30] According to Tahmisian, the Bylaws were never amended to reflect the expansion of the Board of Directors to three.  Doc. No. 72-1 at ¶ 22.
[31] With the exception of the reference to Roger Homles in the minutes, there is no further indication he played any role on the Board.
[32] Doc. No. 96-4.
[33] Doc. No. 96-5.

MEMORANDUM OF DECISION–9

This attention to detail in the minutes—or even the fact of keeping minutes—declined after these initial board and shareholder meetings.[34]

### 3. IDOL terminates Tahmisian, Barrett, and Watt

Tahmisian, Barrett, and Watt were terminated by IDOL on October 30, 2015.[35] Despite filing lengthy declarations in support of and opposition to the Motion, neither Barrett nor Tahmisian provide any detail regarding the reasons for their termination, except, "IDOL made it clear they would not authorize Netacent to utilize iUS as a transfer system."[36] Following their termination from IDOL, Barrett and Tahmisian agreed to work exclusively for Netacent, rather than either Emergent or Netacent LLC. Eventually through inactivity, both Emergent and Netacent LLC were administratively dissolved.

Almost immediately following their termination from IDOL, Tahmisian and Barrett each agreed to give Watt 500 shares in Netacent and make Watt a board member. This transfer of shares was recorded in the minutes of the Board of Directors meeting held November 4, 2015.[37] Despite having agreed to do this in the fall of 2015, issuing stock certificates remained an open issue at the April 2016 Board Meeting.[38] Tahmisian's notes from that meeting indicate, "stock certificates need to be finalized to reflect the ownership percentage of Gregg Tahmissian [sic] (45%), Isaac Barrett (45%) and Quinn Watt (10%)."[39] It is unclear if or when Watt ever received his stock certificate.

---

[34] The record does not include minutes from such meetings for late 2017 through October 2021. It is alleged that some corporate documents were lost when Tahmisian moved from Idaho to Alabama.
[35] See 72-1 at ¶¶ 5, 21–22.
[36] Doc. No. 72-1 at ¶ 21.
[37] Doc. No. 72-1 at ¶ 22; Doc. No. 96-9; Doc. No. 46-29 at Ex. 2. It appears Watt took the minutes of the meeting and sent a draft to Tahmisian. Doc. No. 96-8. However, the record contains a second version of the meeting minutes wherein the transfer of 500 shares each by Tahmisian and Barrett to Watt was omitted. Doc. No. 96-10 at pp. 34-35. The transfer of those shares to Watt does not appear to be a disputed fact.
[38] Doc. No. 96-12.
[39] Doc. No. 96-16.

MEMORANDUM OF DECISION–10

At some point in 2015, McAllister joined Netacent as a consultant providing advice on the requirements for building a UI system.[40]  When McAllister initially joined Netacent, it was building a cloud-based UI system but did not have any UI customers.[41]

### 4.  Netacent's UI system and its first significant client, Alabama Dept. of Labor

In July 2017, the State of Alabama Department of Labor ("ADOL") contracted to utilize Netacent's UI system.  The initial contract between ADOL and Netacent had a term of November 1, 2017, to October 31, 2018.[42]  In exchange for "updating a 40 year old mainframe system nearing the end of its cycle, integrating current UI systems, [and] integrating up to date Federal, State and local mandated UI requirements," ADOL agreed to pay Netacent $2,095,160.64.[43]  This initial contract between ADOL and Netacent was amended twice.  The term of the contract was first extended from November 1, 2018, to October 31, 2019 and later from November 1, 2019 through October 31, 2020.[44]  The amount to be paid Netacent did not change.  Netacent received payments from ADOL on the following days and in the following amounts: October 23, 2019—$1,518,360.80; December 26, 2019—$180,638; and March 11, 2020—$389,150.88.[45]  As of October 31, 2020, the contract between Netacent and ADOL was fulfilled.[46]

The period from acquisition to implementation of the ADOL system spanned two and one-half years.  During that time, McAllister helped educate ADOL staff on how the Netacent UI system worked and built internal reports for the ADOL accounting and program staff to facilitate the transition to Netacent's UI system.  On January 6, 2020, the ADOL UI system went live.

---

[40] Doc. No. 71 at 9.
[41] Doc. No. 71 at 9.
[42] Doc. No. 96-56.
[43] *Id.*
[44] Doc. Nos. 96-57 & 96-58.
[45] Doc. Nos. 96-59 & 97-24–97-26.
[46] Doc. No. 96-60.

MEMORANDUM OF DECISION–11

Prior to its receipt of any revenue from ADOL, Netacent's finances and cash flow were uncertain at best.  Tahmisian was responsible for managing Netacent's cash flow challenges.  Through a combination of loans from any source willing to extend credit to Netacent (i.e., family members, conventional lenders, and employees), Netacent was able to bridge the gap between Tahmisian, Watt, and Barrett's termination from IDOL until it began to realize revenue from ADOL.[47]

One arrangement that permitted Netacent some cash flow flexibility was attributable to Netacent's employees.  In many instances, employees agreed to accept less than full payment of their earned wages and continue working in exchange for Netacent's promise that it would pay the difference with interest when it had the resources to do so.[48]

As President of Netacent, the Bylaws gave Tahmisian the authority to execute contracts, deeds, documents, and instruments as necessary, unless the board designated another procedure.[49]  Absent in the record is any indication the board designated an alternative procedure at any point when he was President.  The Bylaws further provided that checks, notes, drafts and demands for money shall be signed by the officer or officers from time to time designated by the board.[50]  Nothing in the record suggests the board designated a specific procedure that supplemented, amended, or otherwise set out a specific procedure.

---

[47] Doc. Nos. 96-34–96-42.
[48] Tahmisian characterizes the arrangement as a "deferred compensation program." Doc. Nos. 72-1 & 89-101.  The Netacent Parties submitted a series of declarations stating that the declarant was not aware of any of any type of deferred compensation plan that Netacent currently or has ever offered.  Doc. Nos. 46-3 at ¶ 2 (David Hopkins); 46-4 at ¶ 3 (Dominique Barrett); 46-5 at ¶ 6 (Jordan); and 46-23 at ¶¶ 81–82 (Barrett).  Although the declarations dispute whether a "plan" exists, the detailed statements in Tahmisian's declaration explaining the manner in which employees were paid are unrefuted.
[49] Bylaws at ¶ 10.1, Doc. No. 46-24.
[50] Bylaws at ¶ 10.2, Doc. No. 46-24.

MEMORANDUM OF DECISION–12

> ### 5. Intermittent disagreements and conflict between Tahmisian, Watt, Barrett, and McAllister occurred shortly after all four joined Netacent in 2015 and escalated as time went on

Not long after Watt and McAllister joined Netacent in 2015, conflicts over the long-term direction of the corporation began to emerge.[51]  Some of the disputes revolved around product development, as Watt and Tahmisian favored a "platform" approach while Barrett did not, resulting in heated discussions.  Ultimately, Watt and Tahmisian deferred to Barrett so that work could begin.  In addition to conflict over specific design or development decisions, Tahmisian and Barrett did not agree on the long-term vision for Netacent.  These disagreements continued to plague product development and threatened Netacent's ability to complete its work for ADOL.

Tahmisian and McAllister exchanged emails beginning on November 3, 2017, discussing a series of issues.[52]  In one exchange, Tahmisian explained:

> Quinn, Jordan, Josh, Daniel, and David all want me to do something about Isaac not focusing on product development, getting into their code and redoing it, just in general not respecting boundaries or following through with things.  I get calls every week and spend hours on the phone with them or in person.  Now their anger has turned to me for being impotent to do something about the problem that is staring everyone in the face.

To this email, McAllister responded, in part:

> It would be nice if Isaac didn't have the security rights to modify source code.  Obviously he needs full rights on the database, but his access to source code should be read only.  I'm sure he would fight that tooth and nail, but it would force him to mentor developers instead of just changing their stuff directly.  Also, it follows Quinn's effort to define roles and responsibilities. . . . Isaac is certainly a challenge.  I think everyone including many at IDOL would agree with that statement.[53]

---

[51] Doc. No. 72-3 at ¶¶ 10–12.
[52] Doc. No. 96-32.
[53] *Id.*

MEMORANDUM OF DECISION–13

That same day, McAllister offered Tahmisian a proxy to vote his shares.[54]  Tahmisian responded to this offer on November 5, 2017 by stating, "I appreciate your proxy offer and I will send an email to you, Quinn, and Jordan asking for at least two out of the three of you to give me your voting rights to get to at least 51%."[55]  Later that day, Tahmisian authored a detailed email to McAllister, Watt, and Jordan acknowledging the frustration being experienced in the company.[56]  He referred to the "Isaac situation" and explained, "we have to walk on eggshells and do stupid things that waste our time and make us angry in order to deal with it."[57]  Later Tahmisian explains, "the situation with Isaac is a symptom of a bigger problem . . . ."[58]

According to Tahmisian, Netacent's management had been a "dumpster fire" and the toxicity incapacitated everyone to some extent.[59]  He further explained:

> We have a president, but we all know that every decision must go through the Board.  I don't have the power to enforce anything.  I don't think the "shared leadership" model is good for any company in our situation (i.e., a small company where the exact same people are the shareholders, directors, management, and employees).  Without a final decision maker, the simplest things become ridiculous four-hour discussions where whoever argues the longest and makes the discussion the most painful wins.  I think we are all tired of this; it makes our company unproductive, and it makes us angry.[60]

McAllister responded and advised Tahmisian, Watt, and Jordan of his own frustration explaining, "We've spent far too much time arguing – sometimes over inconsequential stuff – and too little time on the task at hand – doing a superb job for Alabama."[61]

---

[54] Doc. No. 96-32.
[55] *Id.*
[56] Doc. No. 96-21.
[57] *Id.*
[58] *Id.*
[59] Doc. No. 96-33.
[60] *Id.*
[61] Doc. No. 96-21.

MEMORANDUM OF DECISION–14

Tahmisian proposed to Jordan, McAllister, and Watt that he purchase their shares, "so that I can have the majority of voting stock."[62]  At this time, he proposed to acquire only the voting rights, while the seller would retain the economic interest in the stock.

That same email was forwarded to Jordan and Quinn approximately ten weeks later on January 17, 2018, with the following offer:

> Here's an offer, in exchange for your voting shares I'll give you:
>     • $50,000 check right now
>     • non-voting shares* equating to 10% ownership of the company
>     • guaranteed employment for 5 years at $150,000 per year
> *equally entitled to everything to which voting shares are entitled (e.g. dividend distributions, payoff upon company sale, etc.) with the exception of voting rights[63]

Ultimately, McAllister and Watt agreed to sell their shares to Tahmisian.

*B.  Stock Sale and Purchase Agreements between Tahmisian and McAllister and Tahmisian and Watt*

### 1.  Tahmisian and McAllister Stock Purchase Agreement

It is undisputed that McAllister had 1,000 shares of stock.[64]  Tahmisian sought the voting rights affiliated with those shares for which he offered to pay McAllister $101,000.[65]  Tahmisian and McAllister entered into a Stock Purchase and Sale Agreement on June 8, 2018 ("McAllister Purchase and Sale Agreement").[66]  The McAllister Purchase and Sale Agreement recited that Tahmisian wished to acquire the voting rights of McAllister's shares, while ensuring that McAllister retained the financial benefits associated with the shares.[67]  The consideration for the purchase was $101,000.[68]  McAllister was paid $1,000 at closing by a check from Tahmisian's personal checking account, and the $100,000 balance was paid on October 20, 2020 by a

---

[62] *Id.*
[63] *Id.*
[64] Doc. No. 46-10 at Ex. 7.
[65] Doc. Nos. 46-18; 46-12, at ¶¶ 3-4; 72-1 at ¶ 61.
[66] Doc. Nos. 46-32; 71-2.
[67] *Id.*; Doc. No. 72-1 at ¶ 64.
[68] *Id.*

MEMORANDUM OF DECISION–15

cashier's check from Wells Fargo.[69]  An Employment Agreement dated June 1, 2018 was entered into by Netacent and McAllister.[70]  It was signed by McAllister on June 8, 2018, but was not signed by a representative of Netacent.  Neither Tahmisian nor McAllister contend this was part of the consideration for the McAllister Purchase and Sale Agreement.

Approximately six weeks later, in a November 11, 2020 email from Tahmisian to McAllister, Tahmisian proposed buying McAllister's shares outright, ostensibly for tax reasons.[71]  In response, McAllister proposed a price of $500,000 over five years beginning in 2021.[72]  Tahmisian replied that he would pay McAllister the $500,000 plus $315,000 in back pay the following week.[73]  Tahmisian and McAllister executed a Bill of Sale for Stock ("Bill of Sale") on December 5, 2020.[74]  According to its terms, in exchange for an additional $500,000, for a total of $601,000 for the complete transaction, Tahmisian would purchase McAllister's beneficial interest in the shares that were the subject of the June 2018 Purchase and Sale Agreement.  On December 4, 2020, Tahmisian paid the $500,000 via a cashier's check drawn from Wells Fargo Bank.[75]  The source of all funds associated with these transactions is disputed.  By its terms, the Bill of Sale supersedes all prior agreements, including and expressly the McAllister Purchase and Sale Agreement.[76]

The record is unclear when Barrett learned of the McAllister stock sale.  Tahmisian informed Barrett directly about the transaction on September 10, 2021.[77]  Furthermore, McAllister explicitly advised Barrett and Watt that Tahmisian had acquired his shares on

---

[69] Doc. Nos. 46-15; 46-18; 72-1 at ¶ 63.
[70] Doc. No. 97-15.
[71] Doc. No. 96-30.
[72] *Id.*
[73] *Id.*
[74] Doc. Nos. 46-16; 96-31.
[75] Doc. Nos. 46-17; 72-1 at ¶¶ 69–70.
[76] Doc. Nos. 46-16 at Ex. iv; 96-31.
[77] Doc. No. 97-2 at ¶ 25.

MEMORANDUM OF DECISION–16

November 6, 2021, writing "At one point Gregg tried to buy the voting rights of both my stock and [Watt's]. He bought my stock so he has those voting rights, but I never heard whether he bought [Watt's] voting rights."[78]

The sale was not recorded in Netacent's stock transfer book. The record demonstrates McAllister attempted to obtain his stock certificate so he could sign the shares over to Tahmisian, consistent with the Bill of Sale. In an email dated September 21, 2019 from McAllister to Tahmisian, McAllister wrote, "By the way, I never did get the stock certificates. It's not a big deal. I was just wondering what happened with that and thought I'd ask…. As far as I'm concerned you're the true owner since you put up the vast majority of the capital."[79] To this email, Tahmisian replied, in part: "I believe Isaac has the stock certificates and I would have thought he'd send them out."[80] Furthermore, on November 23, 2021, McAllister emailed Barrett and Watt and noted it was clear his stock certificate has been lost, and wrote, "Please consider this email my formal request to have that lost stock certificate reissued."[81]

As will be discussed below, an action was later filed in state court. In connection with that case, McAllister cooperated with Tahmisian's counsel to obtain the stock certificate, and filed a declaration in the state court action in which he testified about the stock transfer.[82] He stated that "Netacent keeps saying that officially I still own the stock, and I keep telling them that is not the case. Clearly the bill of sale indicates I sold my stock to Gregg Tahmisian, and a copy of that bill of sale was provided to Isaac Barrett by me."[83] Next, he noted that he attempted to execute and deliver the instruments of conveyance, but that "Isaac Barrett indicated he would

---

[78] Doc. Nos. 96-53, 96-66.
[79] Doc. No. 96-29.
[80] *Id.*
[81] Doc. No. 96-67.
[82] Doc. Nos. 96-68, 96-69.
[83] *Id.*

MEMORANDUM OF DECISION–17

work on reissuing the stock certificate starting Monday, November 29, 2021.  As soon as I

receive the reissued certificate, I will turn it over to Gregg Tahmisian."[84]  Finally, he stated, "I

have taken all possible actions to either find the original stock certificate or to have the stock

certificate reissued.  Any failure to do either in a timely fashion is not due to any action or lack

thereof on my part."[85]

On November 23, 2021, McAllister informed Tahmisian's attorney:

> For your information I've asked both Gregg and Isaac for the stock certificate on
> several occasions.  Gregg indicated that Isaac had it, but Isaac has been unable to
> find it. I would like to get the certificate reissued and would obviously sign it over
> to Gregg.  However, Isaac indicated that he was out of blank certificates and that
> the board has taken action to freeze stock transfers until the next stockholder
> meeting.  I forwarded your affidavit to Isaac, and have also asked him to reissue
> the stock certificate.  John.[86]

On January 5, 2022, McAllister was provided Stock Certificate No. 8.[87]  He related the

details in his declaration:

> On January 5, 2022 I attended what appeared to be a Netacent Board
> meeting at Gravis Law Offices, which as I recall, was attended by Isaac Barrett,
> Jordon Barrett, Quinn Watt and Michael Pietruszewski (Netacent, Inc. legal
> counsel).

> At that meeting Isaac Barrett handed Stock Certificate No. 8 to me and I
> looked at it and stated that I need to fill out the assignment of this certificate.
> Michael Pietruszewski directed that I leave it blank.  I responded that I have to fill
> it out and I have to have Gregg Tahmisian's name on it.  Michael Pietruszewski
> told me not to put Gregg Tahmisian's name on it and stated, something to the
> effect, that putting Gregg Tahmisian's name on the assignment would complicate
> matters for Netacent.  After some further discussion regarding the wording of the
> assignment and my insistence on including Gregg Tahmisian's name on the
> assignment of Stock Certificate No. 8, Michael Pietruszewski recommended I
> execute the transfer form on the backside of Certificate No. 8 as follows:
> "Netacent Inc. Gregg Tahmisian, CEO".  I then wrote those words on the transfer

---

[84] *Id.*

[85] *Id.*

[86] Doc. No. 96-19.

[87] Regardless of whether the fact is disputed, the record is not clear when McAllister was initially given his 1,000 shares.  He joined Netacent in 2015, and the share transfer ledger, discussed below, indicate his shares were issued on August 28, 2017.

MEMORANDUM OF DECISION–18

form assignment and delivered Stock Certificate No. 8 to Isaac Barrett, who hand wrote in large print and in ink on the face and back of the Certificate "REACQUIRED AND DISPOSED 1/5/2022."[88]

This action was repudiated by McAllister in his declaration when he stated,

> Certificate No. 8 assignment transfer to "Netacent Inc. Gregg Tahmisian, CEO" is in error because the above stated *Stock Sale and Purchase Agreement* and *Bill of Sale for Stock* for the sale of my stock represented by Stock Certificate No. 8 was with Gregg Tahmisian as buyer, and I have never entered into any stock redemption agreement with Netacent, Inc.[89]

In his declaration, McAllister insisted that the transfer form on the back of Stock Certificate No. 8 "must be corrected to designate the transfer of those shares to Gregg Tahmisian, and a new stock certificate can then be issued to Gregg Tahmisian and this transfer and assignment properly registered on the stock transfer books of Netacent, Inc."[90]

Finally, on January 10, 2022, at Tahmisian's request, McAllister granted an irrevocable proxy to Tahmisian permitting Tahmisian to vote his shares, which proxy would expire when Tahmisian's ownership of the shares McAllister transferred to Tahmisian were recorded as such by Netacent.[91]  Ultimately, the board voted to reacquire McAllister's 1,000 shares and "disposed" of them.[92]  McAllister abstained from this vote.[93]

### 2.  Tahmisian and Watt Stock Purchase Agreement

On February 21, 2018, Tahmisian and Watt executed a Stock Sale and Purchase Agreement ("Watt Purchase and Sale Agreement").[94]  The Watt Purchase and Sale Agreement included the same material terms as the McAllister Purchase and Sale Agreement.  In exchange

---

[88] Doc. No. 96-20 at ¶¶ 15–16 (capitalization in original).
[89] *Id.* at ¶ 17.
[90] *Id.* at ¶ 18.
[91] Doc. No. 96-72.
[92] Significant questions exist whether this and other actions taken by the Board were valid.  Resolution of these questions is dependent on whether Tahmisian acquired the McAllister and Watt shares of stock.
[93] Doc. No. 96-76.
[94] Doc. Nos. 46-10 at Ex. B; 72-1 at ¶ 51; 96-23.

MEMORANDUM OF DECISION–19

for payments totaling $100,000, Tahmisian purchased the voting rights of Watt's 1,000 shares of stock, while Watt retained the economic rights associated with the shares.[95]  The payment was made in three transactions: two wire transfers of $25,000 each from Tahmisian's personal checking account in February 2018, and a $50,000 cashier's check drawn at Wells Fargo on October 20, 2020.[96]  The source of all funds paid in connection with this transaction is disputed.

A separate Employment Agreement was executed that same day between Netacent and Watt, with Tahmisian signing as President of Netacent.[97]  It provides for a term of employment of November 1, 2015–October 31, 2025 at an annual salary of $150,000.[98]  Notably, this salary was guaranteed "whether or not the Employee continues to work for [Netacent] during the [employment period]," including if Watt was terminated, though not if he voluntarily quit.[99]  It is disputed whether this contract was part of the consideration for the purchase of Watt's voting rights.  While the Watt Purchase and Sale Agreement does not refer to any employment contract, Watt testified that he would not have sold his stock without the employment contract.[100]

While Watt does not dispute executing the Watt Purchase and Sale Agreement on February 18, 2018, nevertheless he has since taken inconsistent positions regarding his shares.  On one hand, Watt admitted to selling the shares.  In an email dated December 28, 2020, he sent to Tahmisian, Watt wrote,

> Another thing I did that I think is instrumental in getting us where we are today was that I sold you my voting rights as you requested so that you could get us the money we needed to go-live and be successful.  It wasn't easy or pretty but I finally did.  If I remember correctly, you said that without having total control of the company (you might not have said exactly that but it was in that ballpark) you didn't feel like you could get the money that we needed and we'd never go-live—

---

[95] *Id.*
[96] Doc. No. 46-23 at Ex. 14.
[97] Doc. No. 96-50.
[98] *Id.* at Article I ¶¶ 1-2.
[99] *Id.* at Article I ¶ 3; Article III ¶¶ 3-4.
[100] Doc. No. 96-63

MEMORANDUM OF DECISION–20

> we'd fail.  I tried to tell you that I'd make good decisions with my voting power
> but you did not trust me to do so—you needed me to trust you and I did—so I
> ended up selling my voting rights to you which you did pay me for so I do
> appreciate that.[101]

He also acknowledged selling the voting rights to his shares to Tahmisian in 2018 in a declaration filed in the state court action.[102]

On the other hand, despite acknowledging the sale of his voting rights to Tahmisian in 2018, in 2021 Watt asserted his voting rights at the November 18, 2021 shareholder meeting where he participated in adopting a resolution to invalidate the Purchase and Sale Agreement he entered into with Tahmisian.[103]  Further, Watt attended the December 10, 2021 shareholder meeting at which he acknowledged the amended and restated bylaws and acknowledged the closure of the stock transfer book.[104]  Watt also signed the Joint Consent Agreement on November 1, 2021,[105] and voted at the shareholder meeting on January 10, 2022.[106]

### C.  Shareholder composition and Share Transfer Ledger

The composition of the shareholders prior to Tahmisian's Stock Purchase Agreements with McAllister and Watt was as follows: Tahmisian and Barrett held 31% each; McAllister, Jordan, and Watt held 10% each; and Josh Fieldstad, Daniel Hope, Dominique Barrett, and David Hopkins held 2% each.[107]  However, despite the recognition in the minutes of the November 3, 2017 Board of Directors meeting that these were Netacent's shareholders, shares

---

[101] Doc. No. 96-24.
[102] Doc. No. 96-63.  On the other hand, the declaration provides that "Tahmisian first approached me about buying my shares in the fall of 2020."  *Id.* at ¶ 4.
[103] Doc. No. 46-42.
[104] Doc. No. 46-43.
[105] Doc. No. 96-64.  It is unclear whether he signed as a board member or shareholder.
[106] Doc. No. 96-74.  These inconsistent statements are impossible to reconcile.
[107] Doc. Nos. 46-10 at Ex. 7; 96-14.

were neither issued nor the stock transfer registry updated to reflect these transfers at the time the

transfers occurred.[108]

Both the Articles of Incorporation and the Bylaws address company shares, including

their transfer.  In the Articles of Incorporation, the only prohibition of a sale or transfer of shares

is that "No shareholder of the Corporation may sell or transfer shares except to another

individual who is eligible to be a shareholder of the Corporation."[109]  As for the Bylaws, Article

3 addresses company stock.  Germaine to the matters before the Court, the Bylaws provide that

stock certificates will be issued in numerical order and will be signed by an officer of the

corporation.[110]  Transfer of stock is addressed as follows:

> **3.2 <u>Transfer</u>**: Transfers of stock shall be made only upon the stock transfer
> books of the corporation, kept at the registered office of the corporation or at its
> principle place of business, or a the office of its transfer agent or registrar; and
> before a new certificate is issued.  The old certificate shall be surrendered for
> cancellation.  The Board of Directors may, by resolution, open a share register in
> any state of the United States, and may employ an agent or agents to keep such
> register, and to record transfers or shares therein.[111]

To this end, Netacent maintained a stock transfer book which Barrett maintained at his

residence.[112]  As noted above, when Netacent was formed on July 1, 2013, Tahmisian and Isaac

owned 5,000 shares each, which was recorded in the stock transfer book as stock certificate

numbers 1 and 2 respectively. As of the date the summary judgment motion was filed, the stock

transfer book read as follows:[113]

---

[108] Doc. No. 72-1 at ¶¶ 39-45.
[109] Doc. No. 71-6 at ¶ 4.2.
[110] Doc. No. 46-24 at Ex. 1 ¶ 3.1.
[111] Doc. No. 46-24 at ¶ 3.2 (emphasis in original).
[112] Doc. Nos. 72-1 at ¶ 12; 46-23 at Ex. 7.  In the Joint Consent Resolution of the Board of Directors and
Shareholders of Netacent Inc., dated November 21, 2021, Netacent explicitly acknowledges, "that record of the
Shareholders and prior issuances of stock and the redemption thereof has not been consistent and in accordance with
the laws of the State of Idaho and the bylaws of the Corporation."  Doc. No. 71-6.
[113] Doc. No. 46-30.

MEMORANDUM OF DECISION–22

| Name | Date | Certificate No. | Shares |
|------|------|-----------------|--------|
| Tahmisian | 7/1/13 | 1 | 5,000 |
| Isaac | 7/1/13 | 2 | 5,000 |
| Voided (improper issuance) | | 3 | |
| Tahmisian | 8/28/17 | 4 | 3,100 (1,900 shares deducted from Certificate #1) |
| Isaac | 8/28/17 | 5 | 3,100 (1,900 shares deducted from Certificate #2) |
| Voided (Quinn's name misspelled) | | 6 | |
| Jordan | 8/28/17 | 7 | 1,000 (shares deducted from Certificate #2) |
| John | 8/28/17 | 8 | 1,000 (500 deducted from Certificate #1) (500 deducted from Certificate #2) |
| Dominique Barrett | 1/6/20 | 9 | 200 (deducted from Certificate #2) |
| David Hopkins | 1/6/20 | 10 | 200 (deducted from Certificate No. 2 |
| Joshua Fieldstad | 1/6/20 | 11 | 200 (deducted from Certificate No. 1) |
| Daniel Hope | Failed to vest | 12 | 200 (deducted from Certificate No. 1) |
| Quinn | 8/28/17 | 13 | 1,000 (shares deducted from Certificate #1) |
| Isaac | 11/18/21 | 14 | 100 (shares reverted after Daniel Hope failed to vest) |
| Tahmisian | 11/18/21 | 14 | 100 (shares reverted after Daniel Hope failed to vest) |

An electronic version of Netacent's share registry dated March 11, 2022 showed Tahmisian with 3,200 shares, Watt with 1,000 shares, and McAllister is absent from the list. The total number of shares in that document is 9,000.[114]

---

[114] Doc. No. 96-78.

MEMORANDUM OF DECISION–23

### D. Completion of Delivery of UI to ADOL and Solid State's Formation

Despite the internal difficulties, Netacent delivered the UI system to ADOL and it went live in January 2020.  Approximately 2 months earlier, on November 6, 2019, Tahmisian formed Solid State, Incorporated ("Solid State").[115]  A month after delivery of the UI system to ADOL, on February 9, 2020, Tahmisian sent an email to Barrett, McAllister, and Watt advising each of them of "a larger shift that I'm implementing which I'm hoping you'll all be as excited about as I am."[116]  This shift corresponded to Netacent's transition from development and delivery of the UI ADOL system to its maintenance.  In this email, Tahmisian announced the creation of Solid State and described its purpose:

> In order to keep Netacent focused on UI software and process improvement for Alabama (and other states we onboard) as well as provide a more flexible work environment for Netacent employees, I've set up another company, called Solid State Operations Inc. dedicated to handling the operations and integration that Netacent is currently doing. I am not leaving Netacent but will be involved with both companies.  Solid State will support Netacent by providing services such as: stable hosting, security, availability, integration (e.g. a database GET environment like what Isaac has wanted, PUT services, etc.), project and contract management, and support. This will free Netacent to focus on Data Station processing and enhancements, new UI applications like RIC and eGov replacements, and implementing UI process improvement for Alabama and other states we onboard.[117]

Thus, Tahmisian anticipated the two corporations can "each succeed in their own, different ways."[118]  Finally, he explained that "Solid State funding will not come at the expense of Netacent.[119]  It will initially be funded out of money beyond the 8% that I negotiate with

---

[115] Doc. Nos. 72-1 at p. 37 of 51; 96-22.
[116] Doc. No. 96-51.
[117] Doc. No. 96-51.
[118] *Id.*
[119] *Id.*

MEMORANDUM OF DECISION–24

ADOL." He closed by noting that he was "planning to roll out raises, health insurance, dental insurance, vision, and company matched 401k for our Netacent staff."[120]

McAllister responded to the email and affirmatively endorsed Tahmisian's plan, stating:

> I really like your approach! I've been concerned for a long time about the transition from development to maintenance. They're two completely different worlds, and it hasn't always been obvious that Netacent was prepared for that. In fact, it has been obvious to me at times that Netacent was not prepared for it. Solid State is a great strategy for fixing that. Solid State is a really good move.[121]

In a later email to Netacent employees on December 31, 2020, Tahmisian noted that several employees had spun off to Solid State.[122] At least at its inception, Solid State was intended to host products from various vendors, including Netacent.[123]

According to Tahmisian, he met with ADOL at some point after his February 2020 email. Following a presentation by Tahmisian, ADOL agreed to continue to pay Netacent 8%, and in addition to that amount, pay Solid State an additional 7% for platform and contract management services.[124] At the end of April, at least some payments from ADOL were routed to Solid State's accounts.[125] The record does not clearly delineate whether a singular payment equal to 15%, separate payments for 8% and 7%, or otherwise how the payments were received and administered by Netacent and Solid State.

Following the agreement with ADOL that provided for payment of 15% (8% and 7%), Tahmisian attempted to unilaterally integrate Solid State and Netacent. In an email to employees of both companies, he began by stating, "Netacent is integrating with Solid State," and proceeded to lay out some of the structure.[126] The email explains his vision: "Netacent and Solid

---

[120] Id.
[121] Doc. No. 96-51
[122] Doc. No. 96-54.
[123] Doc. No. 96-55.
[124] Doc 72-1 at ¶ 193.
[125] Doc. Nos. 46-19; 46-20.
[126] Doc. No. 96-65.

MEMORANDUM OF DECISION–25

are becoming integrated according to the common vision I have for growing both companies, and we're moving forward.  Within this org structure, we're going to be continuing to hire while building processes and documentation that allows us to scale to onboard multiple additional states."[127]  The email was apparently not well received, as even McAllister was shocked by the tone.[128]  Finally, in February 2021, some effort was made to figure out how Netacent and Solid State would work together.[129]  Disagreements over the Netacent and Solid State working arrangement caused produced significant conflict between Tahmisian and Barrett.

E.  *Shareholder Buyout – Tahmisian and Barrett*

When it became clear that Tahmisian, Barrett, Netacent, and Solid State could not reconcile their differences, buyouts were discussed.  The stumbling block appears to have been valuation disagreements.[130]  From June through August 2021, Barrett and Tahmisian discussed different buyout options.  Although the parties' recollections of the substance and impetus for those conversations differ, there is no dispute that as time went on, the discussions proved less productive as evidenced by Barrett's decision to secretly record a meeting with Tahmisian in September 2021.[131]  Thereafter, Tahmisian concluded further discussions would not be productive and he refused to continue to meet with Barrett.

F.  *Barrett and the other shareholders take decisive action, including, an investigation, removal of Tahmisian as an officer and director of Netacent, initiating a lawsuit against Tahmisian, Solid State and others*

1.  Barrett's scrutiny of Netacent's bank statements, finances, and contracts

---

[127] *Id*.
[128] Doc. No. 96-66.
[129] Doc. No. 96-61.
[130] Doc. Nos. 97-2 at ¶¶ 28-30; 96-62.
[131] Doc. No. 97-2 at ¶ 27.

MEMORANDUM OF DECISION–26

In less than two weeks, Barrett met with the other shareholders, caused Netacent to retain counsel, held board meetings, passed resolutions, and filed a lawsuit.  In a relatively short period of time, Netacent's shareholders (excluding Tahmisian) and Board of Directors removed the one person that had to that point been singularly responsible for managing Netacent.  According to Watt, on October 26, 2021, the shareholders directed Barrett "to look into the bank statements, finances, and contracts as much as he could," and conceded that "we didn't know what [Barrett] would find."[132]  He later declared that as of October 27, 2021, "we had uncovered apparent theft."[133]  The next day, October 27, 2021, Barrett and Watt met with counsel from the Gravis Law Firm, and according to Watt, "we discussed the severity of what [Barrett] had found."[134]

The following day, on October 28, 2021, a board meeting was conducted with only Barrett, Watt, and Jordan present.[135]  At the meeting, Barrett presented his results, and as Watt stated, Barrett "showed us . . . . the many red flags that he saw."[136]  At that same board meeting, the Watt Purchase and Sale Agreement was discussed, and "[u]pon disclosure of the use of corporate funds for Gregg Tahmisian's personal interest, the Vice President moved to nullify and void the contract as it presented a clear conflict of interest, assigned liability debt to the corporation, and was never authorized by or disclosed to, the Board or the Shareholders of the corporation."[137]  The motion passed.

On November 1, 2021—five days after Barrett was authorized to look into Netacent's finances—a subset of Netacent's Shareholders and Board of Directors met on November 1, 2021, and passed a "Joint Consent Resolution," that purportedly:

---

[132] Doc. No. 96-63 at ¶ 12.
[133] *Id.* at ¶ 13.
[134] *Id.*
[135] Doc. No. 46-39.
[136] Doc. No. 96-63 at ¶ 18.
[137] *Id.* at ¶ 3.

MEMORANDUM OF DECISION–27

a)     Invalidated the Watt Stock Purchase Agreement;
b)     Removed Tahmisian as an officer and director of Netacent;
c)     Confirmed the Board of Directors was comprised of three directors;
d)     Elected Barrett, Watt and Jordan as the three directors;
e)     Appointed Barrett as President/CEO and Treasurer/CFO, and Watt as Secretary;
f)     Caused Tahmisian to defend, indemnify and hold harmless Netacent;
g)     Acknowledged that prior issuances of stock has been inconsistent, did not comply with Idaho law or the bylaws of the corporation; and,
f)     Approved updated stock record showing the number of shares owned by each shareholder.[138]

Notably, Netacent recognized the validity of the sale of the McAllister stock to Tahmisian and credited him with 4,200 shares, or 42% of the Netacent stock.[139]  The Joint Consent Resolution was signed by Barrett, Jordan, Dominique Barrett, Watt, and David Hopkins.[140]  It apparently intended to be an offer to Tahmisian, which he refused.[141]

In November 2021, Barrett opened a new bank account for Netacent which was not accessible by Tahmisian and transferred the balance of Netacent's funds into that account.[142]

### 2.  Netacent's lawsuit against Solid State, Tahmisian, Joshua Fieldstad, and Caitlin Wambolt

On November 5, 2021, approximately one week after meeting with the Gravis Law Firm, Netacent filed a complaint against Solid State, Tahmisian, Joshua Fieldstad, McAllister, and Solid State employee Catilin Wambolt in Ada County District Court, Case No. CV01-21-17241 ("State Court Action").[143]

---

[138] Doc. Nos. 46-41 & 71-6 at Ex. A.
[139] *Id.*
[140] *Id.*
[141] Doc. No. 46-23 at ¶ 59.
[142] Doc. No. 46-23 at ¶ 58.
[143] *Netacent v. Tahmisian, et al.,* Case No. 23-06020-BPH (Bankr. D. Idaho) (removed state court case), Doc. No. 1 at p. 49 of 105. The Court notes that Tahmisian also filed a state court complaint against Netacent on January 21, 2022, in which he sought unpaid wages. *Tahmisian v. Netacent,* Ada County Case No. CV01-22-01027.  Tahmisian

MEMORANDUM OF DECISION–28

*a. First Motion for a Preliminary Injunction*

On the date the state court action was filed, Netacent filed an Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction.[144]  It appears the motion for a temporary restraining order was withdrawn.[145]  The court held a hearing on the first motion for Preliminary Injunction on November 19, 2021, which hearing transcript is in the record.[146]  At the conclusion of the hearing, the court refused to take any action, citing the need for testimony.[147]  However, the court issued a ruling on February 11, 2022 in which it granted the motion in part.[148]  The ruling required Solid State and Tahmisian to inform Netacent via Barrett within two business days of Solid State receiving funds from any source, with details as to the amount, the source, the date it was received, and any amount Solid State believed Netacent was due from the payment.[149]  Tahmisian was also ordered to transfer to Barrett all login and access credentials to Netacent's Office 365 account, its Azure Portal account, and its visual studio, DevOp.[150]

*b. Second Motion for a Preliminary Injunction*

On December 8, 2021, Netacent filed Plaintiff's Second Motion for Preliminary Injunction ("Second Preliminary Injunction") in the state court action.[151]  The court conducted a hearing on this second motion on January 3, 2022, and issued a written decision on February 10, 2022.[152]  In that decision, the court granted the preliminary injunction in part.  It restricted

---

removed that case to this Court, 23-06019-BPH, and it is now included in the cases consolidated into 23-06018-BPH.

[144] *Id.* at p. 56 of 105.  Doc. No. 72-3 at p. 162 of 177 (ruling)
[145] *Id.* at p. 57 of 105.
[146] *Id.* at p. 60 of 105; Doc. No. 46-13.
[147] Doc. No. 46-13 at p. 189 of 197.
[148] Doc. No. 72-3 at p. 162–171 of 177.
[149] *Id.* at p. 169 of 177.
[150] *Id.*
[151] Doc. No. 46-14 at ¶ 47; Case No. 23-06020-BPH (Bankr. D. Idaho), Doc. No. 1 at p. 62 of 105.
[152] Case No. 23-06020-BPH at Doc. No. 1 pp. 65 of 105 & 70-71 of 105; Doc. No. 46-14.

MEMORANDUM OF DECISION–29

Tahmisian from voting more than 3,200 shares, but acknowledged future litigation could lead to different outcomes, including an increase in Tahmisian's shares, a seat on the Board of Directors, or his election as President or CEO.[153]  Notably, the state court's order explicitly states, "This ruling did not resolve the enforceability, validity, or terms of any agreements between Mr. Tahmisian and Mr. Watt or Mr. McAllister."[154]

On February 24, 2022, Netacent and Barrett filed a Joint Emergency Motion for Temporary Restraining Order, which the state court judge heard the following day.[155]  A partial transcript from that hearing was filed in connection with the briefing.[156]  At the conclusion of the hearing, it does not appear the court granted relief in favor of any party.[157]  It is disputed whether the parties reached any agreement during the hearing to resolve the issues raised in the motion.

*G. Netacent, Shareholder and Board activity after the lawsuit was filed*

<u>1.  Meetings and Minutes through the end of 2021</u>

On November 17, 2021, Netacent's Board of Directors produced an "Official Statement."[158]  It stated, "the current board members are Gregg Tahmisian, Isaac Barrett, Jordan Barrett, Quinn Watt and John McAllister."  Further, it recited the alleged evidence of apparent theft, and stated the board will "fully support, approve, ratify and authorize Isaac Barrett to take all necessary steps to pursue legal action and protect the best interests of the Corporation."[159]  It further stated that the board, "never authorized a change to the Corporation's business plan . . . or to allow Gregg Tahmisian to take any corporate assets, contracts, or opportunities."[160]  Finally, it

---

[153] Doc. No. 46-14 at pp. 29–30.
[154] *Id.* at p. 30.
[155] Case No. 23-06020-BPH at Doc. No. 1 p. 71 of 105.
[156] Doc. No. 46-22.
[157] *Id*.
[158] Doc. No. 46-57; 72-3 at p. 113 of 177.
[159] *Id.*
[160] *Id.*

MEMORANDUM OF DECISION–30

recited that the board "never authorized, or signed any agreement, to cause the Corporation to have a subsidiary, subcontractor, or any other relationship with Solid State Operations, Inc. Solid State is not the parent company of the Corporation."[161]

On December 10, 2021, Netacent's shareholders held a special shareholder meeting.[162] At this meeting, Netacent was represented by its counsel, Gravis Law Firm, and Barrett was represented by separate counsel.[163]  Neither Watt nor McAllister were represented by counsel at this meeting.  Solid State and Tahmisian's counsel attended the meeting.  Tahmisian attended by telephone, but his participation was limited to stating certain objections for the record, after which he left the meeting.[164]

According to the minutes, the Corporation's Stock Transfer Ledger was read aloud. Despite the prior recognition by Netacent on November 1, 2021, that Tahmisian had acquired McAllister's shares and owned 4,200 shares, Netacent now took the position on December 10, 2021, that McAllister still owned 1,000 shares and Tahmisian held 3,200 shares.[165]

Moreover, the minutes reflect a series of actions:

    a)     Tahmisian objections 1, 4, and 5 were approved, and objections 2 and 3 were rejected by the majority of shareholders[166] (the objections related to minutes from a November 18, 2021, board meeting);

    b)     Approval of the November 18, 2021, Board meeting minutes;

    c)     Acknowledgment of Amended and Restated Bylaws; and,

    d)     Acknowledgment of closure of Stock Transfer Ledger.[167]

---

[161] *Id.*

[162] Doc. No. 46-43.

[163] *Id.*  Barrett's individual counsel at the meeting now represents each of the Netacent Parties in this action.

[164] *Id.*

[165] *Id.*

[166] Because McAllister abstained from voting, the conclusion that the vote was supported by a majority of the shareholders assumes that Tahmisian's purchase of Watt's shares was invalid.  The minutes reflect that Barrett, Watt, Dominique Barrett, Jordan, and David Hopkins voted against Tahmisian's objections.  Those same meeting minutes indicate that the total shares associated with those individuals totals 5,600 shares.

[167] Doc. Nos. 46-43; 72-3 at 116

MEMORANDUM OF DECISION–31

The minutes of the December 10, 2021 shareholder meeting state that "Barrett, as acting President and Shareholder, disclosed to the Shareholders that the Stock Transfer Ledger has been closed, as of November 19, 2021, by the Board of Directors, pursuant to Section 6.5 of the Amended and Restated Bylaws, for a period of 50 days."[168]  Nevertheless, McAllister requested on November 23, 2021, that Stock Certificate No. 8 be delivered to him, ostensibly for the purpose of delivering to Tahmisian.  Despite the purported closure of the Stock Transfer Ledger on November 19, 2021 for a period of 50 days, Netacent delivered Stock Certificate No. 8 to McAllister on January 5, 2022, 47 days later after the ledger was supposedly closed.  This occurred at a meeting at Gravis Law Offices, as described above.  When McAllister sought to transfer the stock or otherwise acknowledge that his 1,000 shares were owned by Tahmisian, Netacent's counsel discouraged him.  Instead, McAllister acquiesced and on the advice of Netacent's counsel he completed the transfer section of Stock Certificate No. 8 as follows, "*Netacent Inc. Gregg Tahmisian, CEO*."  Barrett immediately wrote "Reacquired and Disposed 1/5/22" on Stock Certificate No. 8.[169]

### 2.  Barrett's Audit dated December 31, 2021

Barrett submitted to the Board of Directors a document titled, "Audit Report."[170]  The version included in the record identifies "Undisputed Facts."  However, the Fact Analysis, General Conclusions, and Final Conclusion sections are incomplete.[171]  Further, the referenced exhibits are not included.  According to the "Executive Summary," Netacent's Board of Directors requested an investigation on November 18, 2021.[172]

---

[168] Doc. No. 46-43.  The Court cannot find the closure of the Stock Transfer Ledger recorded anywhere in the board meeting minutes.
[169] Doc. No. 71-2 at ¶ 16.
[170] Doc. No. 46-34.
[171] Doc. No. 46-34 at pp. 18–20 of 58.
[172] Doc. No. 46-34.

MEMORANDUM OF DECISION–32

### H.  Netacent Parties' Activities Directed at Tahmisian and Solid State

#### 1.  Websites

Prior to the formation of Netacent, Tahmisian had registered both the "tahmisian.com" and "netacent.com" domain names through his network solutions account.  Tahmisian.com was registered on February 26, 2005, and Netacent.com was registered on December 26, 2007.[173] Tahmisian.com was renewed for five years on December 28, 2020 via email on the networksolutions.com account.[174]  As of May 16, 2022, the registrant and administrative contact for "Tahmisian.com" was listed as Barrett and the registrant and administrative organization was listed as Netacent, Inc.[175]  As of January 3, 2024, the registrant and administrative contact for Netacent.com was Barrett.[176]

The "solidstateops.com" domain name was registered by Tahmisian using his network solutions account on October 20, 2019.[177]  On October 11, 2022, the Solid State Operations Inc. trademark was registered in Idaho.[178]  As of August 21, 2022, the registrant and administrative contact for solidstateops.com was Barrett, and the registrant and administrative organization was Netacent.[179]

On November 2, 2022, Barrett registered a Certificate of Organization for a new Idaho limited liability company known as "Solid State Ops LLC" for which Netacent was listed as the registered agent.[180]  The rationale underlying Netacent's decision to acquire control over the domain name that corresponded to its former shareholder and president's last name is disputed.

---

[173] Doc. Nos. 96-79 & 96-80.
[174] Doc. Nos. 46-33 & 46-54.
[175] Doc. No. 96-81.
[176] Doc. No. 96-80.
[177] Doc. No. 96-83.
[178] Doc. No. 96-85.
[179] Doc. No. 96-82.
[180] Doc. No. 96-73.

Similarly, Netacent's acquisition and control of the other domain name and establishing the new LLC is disputed.

### 2.  Georgia Department of Labor Contract

The Georgia Department of Labor ("GDOL") issued a Sole-Source Intent to Award Justification letter ("Intent Letter") dated September 9, 2022.[181]  The Intent Letter praised the UI product and stated, "GDOL believes that Solid State is the only vendor who can satisfy the technical requirements to implement the iUS code because of their unique competence and expertise.  The iUS system is extremely complex."[182]  Attached to the Intent Letter was a lengthy statement of requirements.[183]

Netacent filed a protest to the Intent Letter on September 23, 2022.  In its protest, Netacent made a series of representations and claims including that it was fully capable of completing the GDOL contract, and as a result, Solid State was not the sole source and the contract should be opened for bid.[184]  Six days after filing its protest, Netacent contacted Solid State and acknowledged that if Georgia's funding for the GDOL contract as not awarded within 24 hours, the funding would be lost.[185]  The funding could not be awarded so long as Netacent's protest of the award was outstanding.[186]  Netacent did not withdraw its protest, and GDOL lost the funding and Solid State lost its award of $26,000,000.

### I.  Bankruptcy Filing

---

[181] Doc. No. 46-55.
[182] *Id.*
[183] *Id.*
[184] Doc. No. 46-56.
[185] Doc. No. 70-6.
[186] *Id*.

MEMORANDUM OF DECISION–34

On January 4, 2023, Tahmisian filed a bankruptcy petition under chapter 11, subchapter V.[187]  This adversary proceeding was filed May 31, 2023, and the instant Motion was filed January 17, 2024.

<u>V.  Analysis</u>

As demonstrated above, there are a significant number of facts for which there is no dispute, and which serve to place the disputed material facts into context.  Under these circumstances, where a litany of facts are not disputed, one might anticipate a number of claims would be capable of resolution on summary judgment.  However, there remain a nucleus of contested facts yet in dispute that are material to resolution of the majority of the claims.  While tempting to list for the parties a recitation of the disputed facts that preclude summary judgment on many of the claims, doing so risks inadvertently providing an incomplete list that complicates the parties' trial preparation.  Rather than do so, the Court's analysis is limited to those claims where the facts are settled and a party is entitled to judgment as a matter of law.  This involves the transaction between Tahmisian and McAllister, and thus affects Claims 2, 7, and 13.

As a preliminary matter, prior to considering the merits of Claims 2, 7, and 13, the Court will address the Netacent Parties' argument that the state court's consideration of certain issues at the preliminary injunction hearing precludes reconsideration of those issues by this Court, or otherwise bars relitigation of those issues addressed.

*A. The state court's prior rulings are not binding on this Court and have no preclusive effect*

The Netacent Parties have repeatedly urged this Court to blindly adopt rulings by the state court as its own.  The rationales for doing so are not persuasive.  Examples of Netacent's arguments include:

---

[187] *In re Tahmisian,* 23-00002-BPH.

MEMORANDUM OF DECISION–35

Netacent agrees that not every issue was conclusively determined by the state court, but several important issues were decided, and the doctrine of issue preclusion applies to such issues. This includes the issue of Tahmisian's attempted stock transactions not being recorded on Netacent's corporate records, among others. Tahmisian attempts to ignore such rulings and hopes to get another bite at the apple by revisiting these matters. Such attempts should not be rewarded. Summary judgment should be entered as to each of the Claims for the reasons below.[188]

Later in the same document, Netacent argues the "law of the case" doctrine should apply and instructs that because Tahmisian has not shown circumstances exist to depart from the law of the case, then "failure to apply the law of the case is an abuse of discretion."[189]  These arguments lack merit.

The Court will first consider the doctrine of issue preclusion.  As a matter of full faith and credit, 28 U.S.C. § 1738 requires federal courts to apply the pertinent state's issue preclusion laws to determine whether relitigation of an issue is precluded in a subsequent federal action.  *In re Greenfield,* 621 B.R. 450, 455 (Bankr. D. Idaho 2020).  The party asserting issue preclusion bears the burden of proving its applicability under state law.  *Id.* (citing *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir. 2001)).  The party must also provide "a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action."  *Kelly v. Okoye (In re Kelly)*, 182 B.R. 255, 258 (9th Cir. BAP 1995), *aff'd*, 100 F.3d 110 (9th Cir. 1996)).  Any reasonable doubts as to what was decided by a prior judgment should be resolved against a finding of issue preclusion.  *Id.*

Under Idaho law, for issue preclusion to apply the party asserting issue preclusion must demonstrate that:

(1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final

---

[188] Doc. No. 85 at p. 3.
[189] *Id.* at p. 9.

MEMORANDUM OF DECISION–36

judgment on the merits in the prior litigation, and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*In re Greenfield*, 621 B.R. at 455 (quoting *Rodriguez v. Dep't of Corr.*, 136 Idaho 90, 29 P.3d 401, 404 (2001)).

Contrary to the Netacent Parties' characterization of the law, ordinarily findings made when ruling on a preliminary injunction motion are not binding on subsequent proceedings because it is preliminary to an anticipated full hearing on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395–96, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). Here, the state court issued a very narrow ruling wherein it granted in part Netacent's request for a preliminary injunction.[190] Scrutiny of the state court's ruling, specifically paragraphs 43-51, demonstrate the ruling was tentative and does not constitute a "final" judgment on the merits for purposes of issue preclusion.

Indeed, the import of the state court's ruling is limited by the language it employed. Specific findings and conclusions were directly cabined by the phrase, "[f]or purposes of this preliminary injunction."[191] Further, the state court explicitly stated that it neither resolved the specific issues presented to this Court, such as the enforceability, validity, or terms of any agreements between Tahmisian, Watt, and McAllister, nor construed any of those agreements.[192] Finally, the state court prospectively acknowledged that Tahmisian may, in the future, have additional shares recorded on the stock transfer ledger, may be elected by the shareholders to the Board of Directors, or be elected by the Board of Directors to serve as President or CEO.[193] The state court's acknowledgment that its immediate ruling did not foreclose future rulings and

---

[190] Doc. No. 46-14.
[191] Doc. No. 46-14 at ¶¶ 45-46.
[192] *Id.* at ¶¶ 47-48.
[193] *Id.* at ¶¶ 49-51.

MEMORANDUM OF DECISION–37

outcomes, including the complete vindication of Tahmisian, undermine the Netacent Parties'

issue preclusion argument.  Collectively, the cited paragraphs evidence a ruling that was

tentative and preliminary.  It was neither a final judgment nor final adjudication of any issues for

purposes of issue preclusion, preventing application of that doctrine.

Turning to the "law of the case" doctrine, the same prohibitions against using statements

and findings made in the context of a preliminary injunction proceeding apply equally to this

analysis.  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of

Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (ordinarily "decisions at the preliminary injunction

phase do not constitute the law of the case," principally because the record is not fully developed

at the preliminary injunction stage and further development of the factual record as the case

progresses may well require a change in the result.); *Ctr. for Biological Diversity v. Salazar*, 706

F.3d 1085, 1090 (9th Cir. 2013) ("In general, however, our decisions at the preliminary

injunction phase do not constitute the law of the case.  This is true for the reason that a

preliminary injunction decision is just that: preliminary.  This rule acknowledges that decisions

on preliminary injunctions … must often be made hastily and on less than a full record.")

(internal citations omitted).

Despite its consideration of the law and the record, this Court can discern no basis in law

or fact for the Netacent Parties' contention that either issue preclusion or the "law of the case"

are applicable.  To the contrary, concluding the state court's limited preliminary injunction ruling

bars this Court's consideration of the merits of summary judgment with a fully developed record

is an invitation to error.  The Court declines the invitation.

MEMORANDUM OF DECISION–38

*B. Partial Summary Judgment is appropriately granted to McAllister and Tahmisian on Claim 2 because Tahmisian acquired McAllister's shares, resulting in Tahmisian owning 42% of Netacent's stock*

The undisputed facts in this case evidence a valid and binding contract between Tahmisian and McAllister. "For a contract to be formed there must be a meeting of the minds between the parties on all material terms to the contract." *Shapley v. Centurion Life Ins. Co.*, 154 Idaho 875, 878, 303 P.3d 234, 237 (2013) (quoting *In re Univ. Place/Idaho Water Ctr. Project,* 146 Idaho 527, 536, 199 P.3d 102, 111 (2008)). A meeting of the minds is evidenced by a manifestation of intent to contract which takes the form of an offer and acceptance. *P.O. Ventures, Inc. v. Loucks Fam. Irrevocable Tr.,* 144 Idaho 233, 238, 159 P.3d 870, 875 (2007) (quoting *Inland Title Co. v. Comstock,* 116 Idaho 701, 703, 779 P.2d 15, 17 (1989)). Moreover, price is considered a material term in the formation of any contract. *J.H. Landworks, LLC v. T. Lariviere Equip. & Excavation, Inc.*, No. 2:11-CV-00488-MHW, 2012 WL 4758079, at *7 (D. Idaho Oct. 5, 2012). "Formation of a contract is generally a question of fact for the trier of fact to resolve." *P.O. Ventures, Inc. v. Loucks Family Irrevocable Tr.*, 144 Idaho 233, 237–38, 159 P.3d 870, 874–75 (2007) (quoting *Inland Title Co. v. Comstock,* 116 Idaho 701, 702, 779 P.2d 15, 16 (1989)). "An unambiguous contract will be given its plain meaning." *Treasure Valley Home Sols., LLC v. Chason*, 171 Idaho 655, 659, 524 P.3d 1272, 1276 (2023) (quoting *Bakker v. Thunder Spring-Wareham*, *LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005)).

Here, two contracts are at issue with regard to McAllister. First, Tahmisian offered to pay McAllister $101,000 for the voting rights affiliated with his 1,000 shares of stock. This was memorialized in the McAllister Purchase and Sale Agreement. All of the hallmarks of a valid and enforceable contract are present: the buyer and seller are identified, both parties understood what was and what was not being sold, the consideration for the transaction was stated, and the

MEMORANDUM OF DECISION–39

terms were set forth in a writing which both parties signed indicating their mutual assent. Tahmisian fulfilled his part and made the required payment which McAllister accepted. And McAllister fulfilled his part of the bargain by not ever voting his shares again, except in the limited instance discussed below. There is no allegation that McAllister's employment contract was tied to the sale of his voting rights. Thus, the McAllister Purchase and Sale Agreement is a valid, completed contract.

Turning to the second transaction, Tahmisian purchased the entirety of McAllister's shares, including future financial benefits, for an additional $500,000. Again, a written contract was drafted which set forth what was being purchased, who the seller and buyer were, and the consideration. Moreover, the Bill of Sale expressly supersedes all prior agreements including the McAllister Purchase and Sale Agreement. Both parties signed and Tahmisian completed his part of the bargain by paying the stated price to McAllister.

Although McAllister once stated he believed Netacent was reacquiring the shares, the contracts are clear on their face that the buyer in each instance was Tahmisian and not Netacent. Neither Tahmisian's prospective intentions regarding the shares, nor the source of funds he used to acquire the shares are material to whether the agreements between McAllister and Tahmisian are valid and enforceable.[194] If, indeed, it is proven that Tahmisian used "stolen" Netacent funds as the consideration for the McAllister transactions, as the Netacent Parties allege, the underlying agreements between McAllister and Tahmisian would not be invalidated. Rather, the use of "stolen" funds may give rise to a cause of action by the Netacent Parties against Tahmisian. Accordingly, the Court finds the contracts McAllister signed with Tahmisian to be valid and enforceable *as between the parties thereto*.

---

[194] McAllister testified he was unaware of the source of the funds paid to him for his shares. Doc. No. 96-70.

MEMORANDUM OF DECISION–40

The Netacent Parties contend that because the transfer of shares from McAllister to Tahmisian was not recorded on the stock transfer ledger, the transactions are invalid. This contention finds little support in the record or the law. First, McAllister repeatedly asked for his stock certificate so he could sign the shares over to Tahmisian. Moreover, the record is undisputed that Netacent, and Barrett specifically, exclusively controlled the manner and mode of stock certificate issuance and maintenance of the corresponding ledger. Rather than complete the ministerial task of issuing a stock certificate and updating the ledger, Barrett initially did not do so. Instead, the task was only completed after litigation was commenced. As such, there is no factual or legal basis for this Court to indulge the fiction that because Barrett refused to complete the task, the underlying transaction between McAllister and Tahmisian was invalid.

Finally, actual ownership of stock is determined based upon a totality of the circumstances. *Weitz v. Weitz*, 167 Idaho 933, 937–38, 477 P.3d 987, 991–92 (2020) (citing 18A Am. Jur. 2d *Corporations* § 607 (2020)). Corporate books and records are frequently used as evidence of stock ownership. *Id.* Stock certificates, however, are "merely prima facie evidence of stock ownership," and are not "necessarily required" to show actual ownership. *Id.* (citing *Thum v. Pyke,* 8 Idaho 11, 66 P. 157, 163 (1901) (Quarles, C.J., dissenting) ("The certificate is prima facie evidence of ownership of the stock named therein, but the owner of stock need not necessarily possess a certificate showing that fact in order to entitle him to the benefits thereof."); *Savic v. Kramlich,* 52 Idaho 156, 12 P.2d 260, 262 (1932) (describing stock certificates as "nothing more nor less than evidence of the stockholder's ownership")).

Accordingly, partial summary judgment is granted to McAllister and Tahmisian as to Count 2. Specifically, summary judgment is granted on the claim that the First Stock Sale and Purchase Agreement is valid and binding and the claim that the Bill of Sale for Stock is valid and

binding, *as between Tahmisian and McAllister*.  Tahmisian acquired McAllister's shares and

based on Netacent's own books and records, Tahmisian owns 42% of the shares of Netacent.

Unlike the McAllister transaction, issues of material fact preclude summary judgment on

the Watt transaction.  Watt has taken inconsistent positions that raise genuine issues of material

fact regarding the terms of his agreements with Tahmisian.  These issues involve, in part, the

employment agreement.  Watt has seemingly taken the position that, as consideration for

Tahmisian's acquisition of stock from Watt, Tahmisian caused Netacent to enter into an

employment agreement that was a sham transaction that rewarded Watt.  To the extent Watt was

a party to a sham transaction, he along with Tahmisian may be equally culpable to Netacent.  At

a minimum, there are disputed facts which make it unclear whether a valid contract existed

between Tahmisian and Watt, and what the scope of the contract was vis-à-vis the employment

contract.

*C.  Partial summary judgment is granted to McAllister on Claim 7*

McAllister is entitled to partial summary judgment on Tahmisian's conversion claim,

while Netacent and Watt are not entitled to summary judgment on this claim.

"Conversion is the act of wrongfully asserting dominion over another's personal property

in denial of or inconsistent with the owner's rights therein."  *In re Parkinson Seed Farm, Inc.*,

640 B.R. 218, 263 (Bankr. D. Idaho 2022) (citing *Med. Recovery Servs., LLC v. Bonneville

Billing & Collections, Inc.*, 157 Idaho 395, 401, 336 P.3d 802, 808 (2014)).  Under Idaho law, a

claim of conversion requires proof of three elements: "1) that the charged party wrongfully

gained dominion of property; 2) that property is owned or possessed by plaintiff at the time

[Defendants gained dominion]; and 3) the property in question is personal property."  *Clark v.

Jones Gledhill Fuhrman Gourley, P.A.*, 163 Idaho 215, 223, 409 P.3d 795, 803 (2017) (quoting

*Sallaz v. Rice*, 161 Idaho 223, 226, 384 P.3d 987, 990 (2016) (quoting *Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010))).

With regard to the 1,000 shares of Netacent stock formerly owned by McAllister, the Court has found the undisputed facts show McAllister sold the full shares (voting and financial rights) to Tahmisian, took measures to attempt to obtain and sign over the stock certificates, never voted at shareholder meetings after the McAllister Purchase and Sale Agreement was executed, and stood by the sale even as shareholder squabbling increased, Barrett refused to issue shares or update the ledger, and legal proceedings began. Thus, Tahmisian cannot prove McAllister wrongfully gained (or retained) dominion of the shares and voting rights that Tahmisian had acquired. McAllister owned the shares until he sold them, but after the sale, he never reasserted dominion over them. To the contrary, he endeavored to cause the shares to be transferred to Tahmisian. Accordingly, McAllister is entitled to summary judgment on Claim 7.

While tempting to conclude Tahmisian is entitled to summary judgment on his conversion claim against Netacent involving McAllister's shares, the overlapping claims and the underlying factual disputes present unique challenges for the Court in resolving the Motion. The challenge is temporal and one that will be resolved at trial when the record can be fully developed.

### D.  Partial summary judgment is granted to McAllister on Claim 13

Tahmisian alleges McAllister and Watt each breached their respective contracts in which they sold their shares to him. To demonstrate a breach of contract under Idaho law, Tahmisian must show the existence of the contract, its breach, that damages resulted from the breach, and the amount of those damages. *Ridenour v. Bank of Am., N.A.*, 23 F. Supp. 3d 1201, 1207 (D. Idaho 2014) (citing *Mosell Equities, LLC v. Berryhill & Co., Inc.,* 154 Idaho 269, 297 P.3d 232,

241 (2013)).

Having concluded the McAllister Purchase and Sale Agreement and Bill of Sale were valid and enforceable, that Tahmisian acquired McAllister's shares and owns 42% of Netacent, that McAllister is entitled to summary judgment on Tahmisian's conversion claim, McAllister is also entitled to summary judgment on the breach of contract claim.  McAllister did not breach the Purchase and Sale Agreement or Bill of Sale.

Tahmisian's purchase of McAllister's stock, including the voting rights associated with those shares, did not affect McAllister's standing as a board member.  Aside from supporting the objection to Eric Taylor acting as Joshua Fieldstad's proxy at the November 21, 2021 shareholder meeting due to a perceived conflict of interest, the record does not reflect that McAllister ever voted as a shareholder after he sold his shares to Tahmisian.[195]  As a result, and as a matter of law, the undisputed facts do not demonstrate a breach of the Bill of Sale by McAllister.  Accordingly, *as to McAllister*, summary judgment is granted on the breach of contract allegation in Claim 13.  Because material facts are in dispute, summary judgment is denied on the breach of contract claim against Watt.

### E.  Summary judgment is otherwise denied

As noted above, significant material facts remain in dispute.  Moreover, due to the interrelatedness of the facts and issues presented, a single disputed fact may affect several different claims.  Accordingly, summary judgment is denied on the balance of the claims included in the Motion.  Because a greater factual record is necessary, and to prevent the possibility of inconsistent rulings, the Court will not comment further.

---

[195] Doc. No. 71-6.

MEMORANDUM OF DECISION–44

VI. Conclusion

The Court concludes that summary judgment is appropriate on Claim 2 *as to Tahmisian and John McAllister only*.  Summary judgment is also appropriate on claims 7 and 13 *as to John McAllister only*.  On all counts against all other defendants, summary judgment is denied.  A separate order will be entered.

DATED: May 28, 2024



HON. BENJAMIN P. HURSH
U. S. BANKRUPTCY JUDGE
SITTING BY DESIGNATION
U.S. COURTS, DISTRICT OF IDAHO

MEMORANDUM OF DECISION–45